# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| LINDA SUE BLAKE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 14-CV-372-PJC |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Claimant, Linda Sue Blake ("Blake"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Blake's application for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Blake appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Blake was not disabled. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

**Claimant's Background**[1]

Blake was 51 years old at the time of the hearing before the ALJ on March 7, 2013. (R. 32). She had an eighth grade education. (R. 33). She said that she had last worked about nine or ten years earlier, and she had to quit due to numerous health problems such as carpal tunnel syndrome, hepatitis C, and diabetes. (R. 34, 39). Blake testified that she had surgery on her right wrist for carpal tunnel syndrome in about 2002. (R. 38-39). Blake had a long habit of smoking about one pack of cigarettes a day, and she was in the process of quitting at the time of the hearing. (R. 34-36).

Blake testified that she could lift about 10 pounds. (R. 36). Previous injuries to her arms made lifting more than 10 pounds painful. *Id.* She could walk about two blocks, and after that her left hip and her back would hurt. (R. 37). She could stand about one hour. (R. 38). She could sit for about one hour if she could shift her position in her chair. *Id.*

Blake had medical care for her hepatitis C, diabetes, and high blood pressure, and she had recently experienced numbness in her feet along with tingling in her arms. (R. 42). She testified that she had been told she had nerve damage in her feet and that her physicians were going to send her for testing. *Id.* She was taking medication for the nerve damage. *Id.* She had trouble picking things up when her hands tingled, which was about twice a day. (R. 45). Her feet tingled most of the time, and she needed to wear shoes due to pain she experienced if she walked barefoot. (R. 45-46). Blake said that she experienced side effects of dizziness and stomach problems from her medications. (R. 42-43).

---

[1] Because Blake's appeal is based solely on two issues stemming from diabetes and neuropathy, the undersigned has summarized only the relevant portions of the physical medical records. Mental health records have not been summarized.

Blake testified that she had a driver's license, and she drove about 30 miles round trip to the grocery store. (R. 33-34). She said that she could do chores around the house, such as laundry, dishes, and cleaning. (R. 43-44). She did not have difficulty with personal hygiene activities such as showering. (R. 47). She did not do any of the yard work. (R. 43). She had previously liked to get out of the house and do activities such as fishing, but it had been a few years since she had been fishing. (R. 44-45). She did not go out to eat, go to movies, or visit with friends or relatives. (R. 45).

Blake was seen at Morton Comprehensive Health Services (the "Morton Clinic") on December 5, 2006 to establish care and to follow up on her diabetes. (R. 227-28). Results from a diabetic foot examination appear to state that Blake's toes tingled and that Blake had decreased sensation on the dorsum of her feet. *Id.* Narrative notes from the office visit state that Blake had not been taking her medications for about three months. (R. 228). Assessments were uncontrolled diabetes, hypertension, and obesity, and she was restarted on medications. *Id.*

Blake returned to the Morton Clinic on October 20, 2007 for chief complaints of pain in both feet, dizziness, and lightheadedness. (R. 218-19). Her diagnoses were hypertension, diabetes with neuropathy, bronchitis, and gastroesophageal reflux disease. (R. 219). She was prescribed several medications. *Id.*

Blake was seen at OSU Physicians (the "OSU Clinic") on March 2, 2010, and her diagnoses included uncontrolled diabetes and uncontrolled hypertension. (R. 251-52). On April 22, 2010, Blake said that she was having some tingling in her feet. (R. 245-46). It appears that

she was prescribed gabapentin.[2] (R. 246). Blake's diabetes was described as uncontrolled at an appointment on August 31, 2010. (R. 396-97). At an appointment on December 6, 2010 at the OSU Clinic, Blake was described as angry and very depressed. (R. 239-40). Her diabetes was described as uncontrolled and insulin-dependent, and she was referred to Family & Children's Services for depression. (R. 240).

Blake returned to the OSU Clinic on March 14, 2011 for follow-up of her diabetes. (R. 401-02). Diagnoses included uncontrolled diabetes, uncontrolled hypertension, depression, tobacco abuse, and obesity. (R. 402). Blake's medications were adjusted. *Id.* In April, Blake's hypertension was controlled, but her diabetes was described as uncontrolled. (R. 403-04).

Blake presented to the emergency room at St. John Owasso Hospital on June 4, 2011 for an episode of diabetic hyperglycemia. (R. 664-711).

At an appointment at the OSU Clinic on June 7, 2011, Blake said that she had gone to the emergency room for an episode of elevated blood sugar. (R. 405-06). Blake's medications were adjusted. (R. 406). On November 28, 2011, Blake complained of several problems, including right hand pain and swelling. (R. 407-08). Her diagnoses included right hand paresthesia, and she was given a wrist brace to wear at night. (R. 408).

Blake was seen at Omni Medical Group on December 1, 2011 with complaints of right hand pain, chronic nausea, and diabetes. (R. 304-06). Notes state that Blake had not had a primary care provider "for awhile" and had not been checking her blood sugar levels. (R. 304). Blake also complained of numbness in both hands. *Id.* The diagnosis was diabetes, not

---

[2] Gabapentin is a medication also referred to by the brand name of Neurontin. Dorland's Illustrated Medical Dictionary 764, 1287 (31st ed. 2007). The undersigned has referred to it as gabapentin although Blake's medical records used both names for the medication.

otherwise specified, and the physician adjusted Blake's medications. (R. 306). Blake returned on December 22, 2011 for follow-up, and she reported that she had pain and swelling in both hands. (R. 301-03). Blake's diagnoses included diabetes without mention of complication, and her diabetes medication was increased. (R. 303).

Blake was seen at Omni Medical Group again on January 19, 2012 with a complaint of bilateral foot pain. (R. 297-300). It appears that a diabetic foot examination showed a decrease in sensation in both feet. (R. 299). Diagnoses included diabetes with neurological manifestations and neuropathy in diabetes. *Id.* Notes state that the physician discussed with Blake that a side effect of uncontrolled diabetes could be neuropathy, and it appears that Blake was prescribed gabapentin. (R. 299-300).

Blake was seen at the OSU Clinic on January 31, 2012 as a follow-up for her diabetes. (R. 409-10). On February 28, 2012, Blake complained that she had numbness of her hands and feet. (R. 411-12). Impressions included uncontrolled diabetes and painful diabetic neuropathy. (R. 412). Her gabapentin prescription was increased. *Id.*

Blake returned to Omni Medical Group on April 5, 2012 for a follow-up appointment for diabetes and hypertension. (R. 320-22). Notes state that Blake complained that she had left arm numbness from her shoulder to her fingertips. (R. 320). Diagnoses included diabetes with neurological manifestations, neuropathy in diabetes, and hypertension, not otherwise specified. (R. 321). It appears that Blake's gabapentin dosage strength was increased. (R. 321).

Blake was seen at the OSU Clinic on July 31, 2012 for a diabetic checkup. (R. 413-14). It appears that the results of a monofilament examination of Blake's feet indicated that she had some lack of sensation. (R. 414). Her medications were adjusted. *Id.*

Examining agency consultant Johnson Gourd, M.D., saw Blake on June 4, 2011, and her chief complaints were hepatitis C and difficulty with concentration. (R. 264-69). The results of Dr. Gourd's examination were normal. *Id.*

Nonexamining agency consultant Evette Budrich, M.D., completed a Physical Residual Functional Capacity Assessment on June 6, 2012. (R. 369-76). Dr. Budrich indicated that Blake could perform work at the "medium" exertional level. (R. 370). Dr. Budrich found no postural, manipulative, visual, communicative, or environmental limitations. (R. 371-73). In the section for additional comments, Dr. Budrich stated that medical evidence showed a history that included diabetes and neuropathy. (R. 376). Dr. Budrich briefly summarized the January 19, 2012 and April 5, 2012 office visits at Omni Medical Group that included bilateral foot pain with diabetic foot examination findings of reduced sensation and diagnoses of diabetes with neurological manifestations and neuropathy. *Id.* Dr. Budrich briefly summarized Blake's activities of daily living and concluded that Blake appeared capable of medium level work. *Id.*

**Procedural History**

Blake filed her application for supplemental security income benefits with a protective filing date of January 18, 2012. (R. 114-20). The application was denied initially and on reconsideration. (R. 64-67, 71-73). An administrative hearing was held before ALJ Edmund C. Werre on March 3, 2013. (R. 26-59). By decision dated March 27, 2013, the ALJ found that Blake was not disabled. (R. 13-20). On May 10, 2014, the Appeals Council denied review. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. § 416.1481.

## Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[3] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084 (citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported

---

[3] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

## Decision of the Administrative Law Judge

In his decision, at Step One, the ALJ found that Blake had not engaged in any substantial gainful activity since her application date of January 18, 2012. (R. 15). At Step Two, the ALJ found that Blake had severe impairments of "history of upper extremity fractures, history of bilateral carpal tunnel syndrome (status post remote (right) release), hepatitis C, left ankle strain, insulin dependent diabetes mellitus, hypertension, obesity, Major Depressive Disorder, and Anxiety Disorder." *Id.* At Step Three, the ALJ found that Blake's impairments did not meet any Listing. (R. 15-16).

The ALJ found that Blake had the RFC to perform work at the light exertional level, with additional nonexertional limitations related to mental health issues. (R. 16). At Step Four, the ALJ determined that Blake could return to past relevant work. (R. 18). As an alternative finding at Step Five, the ALJ found that there were a significant number of jobs in the national economy that Blake could perform, taking into account her age, education, work experience, and RFC. (R. 19-20). Therefore, the ALJ found that Blake was not disabled from the date the application was filed, January 18, 2012. (R. 20).

## Review

Blake makes two arguments on appeal, both of which are related to her diabetes condition and her diabetic neuropathy. Plaintiff's Opening Brief, Dkt. #19. First, Blake says that the ALJ failed to acknowledge her diabetic neuropathy in at least three ways: by failing to list it as a severe impairment at Step Two; by failing to explicitly address it in his decision; and by failing to include any limitations from it in the RFC determination. *Id.* at 5. Second, Blake says that the ALJ erred by failing to develop the record by ordering a consultative examination for further testing of her neuropathy. *Id.* Regarding the issues raised by Blake, the Court finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements. Thus, the ALJ's decision is **AFFIRMED**.

At the outset, the Court notes that at the hearing, the ALJ and Blake's counsel specifically discussed the impact of Blake's peripheral neuropathy. (R. 53-56). Blake's attorney advocated that the peripheral neuropathy limited Blake to work at the sedentary exertional level. *Id.* She also asked that the ALJ consider additional testing to determine the extent of the neuropathy. *Id.* In spite of Blake's attorney highlighting the specific issue of diabetic neuropathy at the hearing, the ALJ gave the issue limited attention in his decision. (R. 15-18). As discussed herein, it would have been preferable for the ALJ to explicitly address the objective medical evidence that was most in Blake's favor on the issue her attorney identified as a key issue. However, the Court concludes that the ALJ's failure to discuss the evidence regarding peripheral neuropathy in more detail does not result in an error that requires reversal. *See, e.g., Milcanovic v. Colvin*, 572 Fed. Appx. 587, 590 (10th Cir. 2014) (unpublished) (it would have been preferable for ALJ to specifically mention listing criteria, but decision was still supported by substantial evidence); *Luttrell v. Astrue*, 453 Fed. Appx. 786, 792 (10th Cir. 2011) (unpublished) (it would have been

preferable for the ALJ to specifically recite why he disregarded certain global assessment of functioning scores, but reversal was not required); *Breneiser v. Astrue*, 231 Fed. Appx. 840, 844 (10th Cir. 2007) (unpublished) (more detailed explanation of vocational reasoning by ALJ would have been preferable). While the Court is affirming the ALJ's decision, the undersigned encourages the Commissioner to ensure that issues highlighted by a claimant's attorney at the hearing are addressed directly by the ALJ in the written decision so that a reviewing court can affirm without need for analysis regarding whether an omission is a "technical" one that does not dictate reversal. *See Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012) (merely technical omissions do not dictate reversal).

The ALJ's references in his decision to Blake's neuropathy were minimal, but sufficient for this Court to affirm. Regarding Blake's first argument related to her first issue on appeal, it was not an absolute requirement that neuropathy be listed as a separate impairment at Step Two. One reason why including neuropathy at Step Two was not a requirement is that an error at Step Two is harmless so long as the ALJ finds at least one condition to be severe, so that the five-step sequential evaluation continues. *Oldham v. Astrue*, 509 F.3d 1254, 1256-57 (10th Cir. 2007) (no error in ALJ's failure to include claimant's reflex sympathetic dystrophy as severe impairment at Step Two); *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (any error at Step Two was harmless when ALJ properly proceeded to next step of evaluation sequence). Therefore, because the ALJ found severe impairments at Step Two, there was no reversible error at this step.

A second reason that omitting the word "neuropathy" from the list of impairments at Step Two does not require reversal is that the ALJ did include Blake's diabetes as a severe impairment. It is at least arguable that Blake's neuropathy was not a separate impairment from her diabetic condition, but was a complication or a symptom of diabetes. *See Lax v. Astrue*, 489

F.3d at 1088 (ALJ's interpretation of doctor's report was reasonable and would not be displaced by reviewing court). The omission of the term "neuropathy" at Step Two therefore does not present any issue requiring reversal.

Blake's next argument is that the ALJ "failed to explicitly address" her neuropathy in the decision. Plaintiff's Opening Brief, Dkt. #19, p. 5. As discussed above, the Court agrees that it would have been better practice for the ALJ to have included more references from the medical treating records in his decision. The ALJ, however, did include several references to neuropathy. First, in summarizing Blake's testimony, the ALJ noted that she said she had numbness and nerve damage in her feet, as well as numbness in her hands. (R. 17). He noted that many records described Blake's diabetes as uncontrolled. (R. 18). He stated that Blake had driven to her consultative examinations in spite of her peripheral neuropathy. *Id.* The Tenth Circuit has often stated that the court takes the ALJ at his word when he states that he has considered all of the evidence. *Wall*, 561 F.3d at 1070. The references described above are sufficient to show that the ALJ was aware that Blake had peripheral neuropathy and that he had considered the evidence related to her diabetes and neuropathy.

Moreover, the issue of whether the ALJ failed to "explicitly address" Blake's neuropathy is closely related to Blake's third argument, that the ALJ "failed to include functional limitations" from the neuropathy in his RFC determination. Plaintiff's Opening Brief, Dkt. #19, p. 5. The question for this Court to answer is whether substantial evidence supported the ALJ's RFC finding that Blake could perform work at the light exertional level. The substantial evidence that supports the RFC determination are the reports of the examining consultant, Dr. Gourd, and the nonexamining consultant, Dr. Budrich. (R. 264-69, 369-76). The ALJ briefly mentioned Dr. Gourd's report, and he stated that he gave the opinion of Dr. Budrich "some

weight," but he changed her suggestion of an RFC for "medium" work to an RFC for "light" work. (R. 17-18).

The results of Dr. Gourd's examination were normal, with absolutely no mention of any peripheral neuropathy problems either by Blake or by Dr. Gourd. (R. 264-69). Dr. Budrich, by contrast, explicitly acknowledged that medical evidence showed a history that included diabetes and neuropathy. (R. 376). Dr. Budrich briefly summarized the January 19, 2012 and April 5, 2012 office visits at Omni Medical Group that included diabetic foot examination findings of reduced sensation and diagnoses of diabetes with neurological manifestations and neuropathy. *Id.* The medical opinion of Dr. Budrich was that Blake appeared capable of medium level work, and Dr. Budrich based her opinion on the Omni Medical Group 2012 records and other evidence. *Id.* Dr. Budrich's opinion was substantial evidence upon which the ALJ was entitled to rely. *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (nonexamining consultant's opinion was an acceptable medical source which the ALJ was entitled to consider and which supported his RFC determination); *Franklin v. Astrue*, 450 Fed. Appx. 782, 790 (10th Cir. 2011) (unpublished) (RFC assessment of agency nonexamining physician was substantial evidence supporting ALJ's conclusion); *Barrett v. Astrue*, 340 Fed. Appx. 481, 485 (10th Cir. 2009) (unpublished) (ALJ was entitled to rely upon opinion of nonexamining psychiatrist). Dr. Budrich's explicit consideration of the medical evidence of record relating to Blake's complaints of diabetic neuropathy buttresses the ALJ's conclusions regarding Blake's RFC and eliminates any question that the ALJ's decision is supported by substantial evidence. Thus, Blake's argument that the ALJ failed to include any limitations related to her diabetic neuropathy miscarries, because the ALJ included more limitations, in the form of a more restrictive exertional category, than did the nonexamining consultant. *See Chapo v. Astrue*, 682 F.3d 1285,

1287-88 (10th Cir. 2012) (no error by ALJ in relying on opinion of examining consultant and tempering the opinion in favor of claimant).

There was no reversible error related to Blake's first issue on appeal related to whether the ALJ had adequately taken into account her diabetic neuropathy.

Blake's second issue involves the ALJ's duty to develop the record:

> The ALJ failed to fully and fairly develop the record, ignoring without cause or explanation the request of Plaintiff's counsel for a consultative exam with EMG/NCS[4] testing regarding Plaintiff's neuropathy.

Plaintiff's Opening Brief, Dkt. #19, p. 5. An ALJ "has a basic duty of inquiry to fully and fairly develop the record as to material issues." *Baca v. Department of Health and Human Servs.*, 5 F.3d 476, 479-80 (10th Cir. 1993). The Tenth Circuit considered the ALJ's duty to develop in the context of the ALJ's discretion to order consultative examinations in *Hawkins v. Chater*, 113 F.3d 1162, 1166-70 (10th Cir. 1997). The court in *Hawkins* noted that the ALJ has broad latitude in ordering consultative examinations. *Id.* at 1166. The "broad latitude" standard has been reaffirmed by the Tenth Circuit in multiple unpublished decisions in recent years. *See, e.g., Duncan*, 2015 WL 1475314 *2; *Lundgren v. Colvin*, 512 Fed. Appx. 875, 878 (10th Cir. 2013) (unpublished); *Harlan v. Astrue*, 510 Fed. Appx. 708, 712 (10th Cir. 2013) (unpublished). The *Hawkins* court summarized three instances in which a consultative examination might be required: (1) when there is a direct conflict in the medical evidence; (2) when the medical evidence is inconclusive; and (3) when additional tests are required to explain a diagnosis already contained in the record. *Hawkins* at 1166.

---

[4] EMG/NCS stands for electromyography/nerve conduction study. *Duncan v. Colvin*, 2015 WL 1475314 *2 (10th Cir.) (unpublished).

13

As discussed above, Blake's counsel requested EMG/NCS testing at the hearing because she asserted that Blake's bilateral foot problems limited her to sedentary work. (R. 53-54). The ALJ said that he would take the request "under advisement," adding that "[i]f not then you'll get a decision, hopefully, within a couple of months." (R. 56). While the Court understands that all claimants would like a specific explanation when they request additional consultative examinations, the undersigned is not aware of any obligation or duty on behalf of the Commissioner to supply a written response to a request for a consultative examination. Blake cites to no authority suggesting that there is any obligation for the ALJ to do so.

Blake has not explained in her brief how her request for EMG/NCS testing falls into the three categories described by the Tenth Circuit in *Hawkins*, and the Court finds that it does not meet the requirements of those categories. Plaintiff's Opening Brief. Dkt. #19, pp. 8-10. In Blake's case, there is no direct conflict in the medical evidence regarding her neuropathy; the medical evidence regarding her neuropathy is not inconclusive; and the additional tests requested are not required to explain Blake's diabetic neuropathy. Instead, there was objective evidence in the record that Blake suffered from some lack of sensation of both feet, in the form of repeated monofilament sensation testing. The agency nonexamining consultant, Dr. Budrich, explicitly acknowledged and summarized this evidence. (R. 376). In spite of this evidence, Dr. Budrich concluded that Blake was capable of medium work. *Id.* In the circumstances of Blake's case, the ALJ was not required to order EMG/NCS testing, and his decision not to order additional testing was within his broad latitude. As discussed above, while it would have been preferable for the ALJ to explicitly address the request for additional testing in writing, there is no requirement that the ALJ do so, and Blake has not cited to any authority suggesting such a requirement. Thus, the

ALJ did not err by failing to order EMG/NCS testing or by failing to explain his reasoning for not ordering the additional testing.

Blake's case is one where the Court, if it were reviewing the evidence *de novo*, might come to a different conclusion from the conclusion reached by the ALJ. The possibility that a different conclusion could have been reached from the same evidence does not equate to a finding that the ALJ's decision lacks the support of substantial evidence:

> The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence. We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.

*Lax*, 489 F.3d at 1084 (citations, quotations, and brackets omitted).

## Conclusion

The decision of the Commissioner is supported by substantial evidence and complies with legal requirements. The decision is **AFFIRMED**.

Dated this 25th day of June 2015.

Paul J. Cleary
United States Magistrate Judge